NEW HAMPSHIRE FIRE INSURANCE COMPANY, Appellant,

v.

PLAINSMAN ELEVATORS, INC., Appellee.

No. 7262.

Court of Civil Appeals of Texas.

Amarillo.

June 3, 1963.

Rehearing Denied Sept. 3, 1963.

Thompson, Coe, Cousins & Irons, Dallas, Day & Owen, Plainview, for appellant.

LaFont, Tudor, Tunnell, Formby & Reep, Morehead, Sharp, Boyd & Tisdel, Plainview, for appellee.

NORTHCUTT, Justice.

For convenience we will adopt the statement of the nature and result of the case as given by appellee. Suit was brought in the District Court of Hale County, Texas, by Plainsman Elevators, Inc., a corporation, against New Hampshire Fire Insurance Company on two separate insurance policies. One of the policies insured a large steel grain tank for the amount of $50,000; two all-steel small grain tanks, $5,000 each; dump and motors, $3,000; all-steel leg, $10,000; and by endorsement the policy was enlarged to insure one Shantzer drier for the amount of $23,000. The second policy sued on issued by the Defendant insurance company was to cover grain stored by Plainsman Elevators, Inc., for the amount of $700,-000. Each policy was issued by the Defendant, New Hampshire Insurance Company, to Lider Grain & Fertilizer, and by endorsement changed to read Plainsman Elevators, Inc., instead of Lider Grain & Fertilizer. Each policy contained insurance against extended coverage which includes "explosion". Plainsman Elevators,

Inc. alleged that the loss occurred by reason of an explosion and the Defendant insurance company contended that there was not an explosion but that the loss was due to the structural failure of the tank.

Upon a trial of the case before a jury, the Court rendered judgment in favor of Plainsman Elevators, Inc., upon the answers of the jury to the special issues submitted. The judgment is severable as to each item insured; that is, it granted recovery as to each item insured based upon the separate answers of the jury to the special issues, the total of all of which items was for the sum of $78,858.22, which included interest on said amounts due Plainsman Elevators, Inc., from the date of April 7, 1960. From that judgment the New Hampshire Fire Insurance Company perfected this appeal and will hereafter be referred to as appellant and the Plainsman Elevators, Inc. will be referred to as appellee.

The first issue inquired if there was an explosion on November 6, 1959, in the large grain tank and the jury answered that there was and the remaining issues were concerning the damage as to the separate items sued for.

The appellant presents this appeal upon fourteen points of error. The first point contends the court erred in admitting testimony of the witness, Weiland, with respect to hypothetical questions based upon assumptions of fact not supported by the evidence. After Dr. Weiland had testified for some time as to what he saw and other matters concerning his right to give his opinion as to whether there was an explosion, he was asked this question: "Now, Dr. Weiland, taking into consideration all of the facts and circumstances that you have testified about here, and the pictures that you have examined, and the thermocables that you have examined—including this one here, do you have an opinion as to whether or not an explosion occurred out there as a cause for the rupture of this building, of this grain bin?" After that

question was asked the following took place:

"MR. COUSINS: Your Honor, for the purpose of the possibility of an objection, may I ask one question?

"THE COURT: Yes. Go ahead.

"VOIR DIRE EXAMINATION.

"BY MR. COUSINS:

"Q Mr. Weiland, assuming that you do have such an opinion, are the things which Counsel has outlined to you in his question the things which you have taken into account in arriving at that opinion?

"A Yes, they are.

"Q Are they the only things which you have taken into account?

"MR. SHARP: Now, if Your Honor please, that wouldn't be any cause for an objection—

"MR. COUSINS: Yes, it would, too. I need an answer to this question. I think it is.

"MR. SHARP: Well, I don't care whether he needs it or not, that would not be any groundwork for any objection.

"THE COURT: Let him go ahead.

"Q (By Mr. Cousins) Let me ask this question. Mr. Weiland: Is your opinion in any way based upon what you were told by any of the people connected with Plainsman Elevators or with any other engineer?

"A No, it is not.

"Q It is not?

"A It is not.

"Q Then, am I correct in assuming that the only things you have taken into account are the things which Counsel has suggested to take into account in arriving at your opinion?

"A That's right.

"Q All right, sir.

"DIRECT EXAMINATION
(RESUMED)

"BY MR. SHARP:

"Q Do you have such an opinion?

"A Yes, I do.

"Q What is that opinion, Mr. Weiland?

"A There was an explosion within the tank."

After several other questions and answers were had this question was asked Dr. Weiland: "All right. Now, let us go into something of the pressure that an explosion can produce. Let us assume that we had a pocket from bridging. Let us say we had one the size of a bushel basket and it was exploded, can you tell the jury something of the pressure that that would create?" Appellant excepted to the question and was overruled by the court. It is from this overruling by the court that point one is addressed. The question as asked was not answered by the witness but the following proceedings took place:

"A The pressure that may be created by an explosion will easily be as high as seven thousand pounds per square foot. In other words, you have an area of a square foot, or if you have a box, say, a foot each way, the pressure that may be created in that box may be as much as seven thousand pounds on each wall of that box.

"Q Now, in relation to what that pressure would do, can you give the jury an example that would illustrate just how much pressure that is and what it would do or could do?

"MR. COUSINS: If Your Honor please, until such time as he relates what it is that an explosion such as seven thousand pounds per square foot, and that it has some relationship of

what may have, in his opinion, exploded in this tank, we're going to object to it.

"MR. SHARP: I'm talking about the type of gases that are produced from the grain that we have been talking about here.

"MR. COUSINS: I repeat my objection, if Your Honor please, until Mr. Weiland says that that's the kind of pressure created by this kind of combustible gas. I'm going to object to any testimony about what would happen under seven thousand pounds per square foot.

"Q (By Mr. Sharp) Mr. Weiland, when you answer, why, relate it to the kind of explosion from the kind of gases that would be produced from the grain like you have testified about here.

"A Okay. The gases that are produced in addition to which we have referred in this case, such as the gases are formed by deterioration process, will produce sufficient energy, will liberate—the explosion of these gases will liberate sufficient energy to raise a weight of one ton to a distance of two hundred feet into the air.

"MR. COUSINS: How much gas are you talking about, Doctor? (Directed to the witness.)

"A What?

"MR. COUSINS: How much gas are you talking about? (Directed to the witness.)

"A I'm talking about a cubic foot of this gas.

"Q (By Mr. Sharp) All right. And would that be sufficient pressure, Doctor, in your opinion, to cause a collapse of a building like we have been—like built out of steel that you saw out there?

"A Yes, it certainly would.

"Q Is it your opinion from all of your examinations, investigations, that such an explosion did occur?

"A Yes, it is.

"Q And at the occasion that we are talking about on the morning of November 6, 1959, in the Tank No. 1 that you viewed the pictures of?

"A Yes, sir."

The final answer was not objected to. There were similar questions propounded to the expert witnesses concerning the power of an explosion and the cause thereof and received without objection. The question involved was whether there was an explosion. Two of the expert witnesses testified in favor of appellee and one in favor of appellant. The point complained of was not based upon a hypothetical question as to whether or not there was an explosion but was as to the pressure that would be created.

■ It appears to be settled in this state that objections to certain evidence are unavailing when similar evidence to the same effect is offered and received without objections. Bolstad v. Egleson, Tex. Civ.App., 326 S.W.2d 506 (NRE); Lubbock Bus Company v. Pearson, Tex.Civ.App., 277 S.W.2d 186 (NRE); Rowe v. Liles, Tex.Civ.App., 226 S.W.2d 253 (writ refused). Appellant's first point of error is overruled.

By appellant's point two it is contended that the court erred in overruling objections to testimony of Weiland because it was based upon hearsay. We think what has been said as to point one above will dispose of issue two. No objection was offered to the testimony given by Weiland when he testified that his opinion was not based upon what he was told but was based solely upon the things counsel has suggested to take into account in arriving at his opinion. No objection was taken at that time as to the basis upon which Weiland based his opinion that there was an explosion. Texas Employers' Insurance Ass'n v. Hicks, Tex.Civ.App., 271 S.W.2d 460 (writ dismissed) and the cases there cited. We overrule appellant's second point of error.

■ Appellant's points three and four insist there was no evidence and insufficient evidence to sustain the findings of an explosion and the findings of explosion was against the overwhelming weight and preponderance of the evidence. Mrs. Frasier testified she was about one city block from the elevator and further testified as follows:

"Q (By Mr. Sharp) All right. On the morning of November 6, what— did you hear anything that woke you up, let's put it that way.

"A What did I hear?

"Q Yes, ma'am.

"A Well, I heard a terrible noise. Do you want me to tell you what it sounded like?

"Q Yes, ma'am.

"A Well, of course, I was sound asleep, two o'clock in the morning or two-thirty, perhaps. I really don't know. And it sounded just exactly like a jet plane flew over and broke the sound barrier. It was terrible. It just scared me to death. And I asked my husband, I said, "Oh, was that an earthquake?" And he just grunted. It didn't scare him, so it didn't bother me. I just went on to sleep.

"Q All right. You didn't get up at that time?

"A No. I looked at my clock at the head of my bed and it said, I think, two or two-thirty. It has been so long I have forgotten really.

"Q And when did you later realize what had happened?

"A Not until twenty minutes to eight the next morning. I went to

work. And I work right where I live. I just go through two doors. That time I worked; I don't work now. And the girls came in and they said, 'Did you see the elevator out there?' And I looked out the door and there it was, just crumpled to the ground and sheet iron just laying everywhere, almost in my yard, and that's what I seen, maize everywhere."

Mr. Stowe testified as follows:

"Q And you are engaged in the operations of a gin out there at Lider?

"A Yes, sir.

"Q And were you so engaged in November of 1959?

"A Yes, sir.

"Q Now, you know the location, do you, Mr. Stowe, of the Plainsman Elevators tanks there at Lider?

"A Yes, sir.

"Q Approximately how far are they located from your gin?

"A Oh, just across the street.

"Q And about how far are they located from your home where you reside out there?

"A Approximately a quarter of a mile.

"Q Approximately a quarter of a mile. Mr. Stowe, do you recall the morning of November 6, 1959, when they had difficulty with the tank out there of Plainsman Elevators?

"A Yes, sir.

"Q Where were you at about two o'clock that morning?

"A I was home in bed.

"Q All right. Now, what was happening in reference to your gin? Was it running or not running?

"A Yes, sir, it was running.

"Q And is your gin located between the elevator and your home?

"A Yes, sir.

"Q All right.

"A Approximately.

"Q And what out of the ordinary did you hear out there that morning?

"A Well, about that time the morning there was a jar; something happened that woke me up. And as I turned on the side of the bed, well, I heard another commotion, about the same, and I run toward the window thinking something happened at the gin. And then I heard the third one.

"Q All right. Now, the first one that you heard, just about how loud or how did it sound, Mr. Stowe?

"A Well, I couldn't say exactly, but it was enough jar and enough racket that it woke me up, and you might say the house jarred or some—something there that woke me up like an explosion, I'd say—"

There was other testimony supporting an explosion besides the testimony of the expert witnesses. We are of the opinion that there was ample evidence sustaining the jury's finding there was an explosion. Appellant's points three and four are overruled.

Appellant's points five, six, seven and fourteen are presented together. All four of these assignments concern a Shantzer Drier. The Shantzer Drier was not installed when the original policy in question was issued but was completed October 31, 1959. The rider to the insurance policy insuring the Shantzer Drier was dated November 25, 1959, and being effective from November 1, 1959. The damage here in question happened on November 6, 1959, being some nineteen days before the date of the rider insuring the Shantzer Drier. Appellant's points five, six, and seven contend the court erred in admitting the en-

dorsement attached to the insurance policy applicable to the Shantzer Drier; in submitting the issues to the jury relating to the Shantzer Drier, and in granting judgment with respect to the Shantzer Drier. Then the fourteenth point contends the court erred in overruling objections to the testimony of the witness, Silverthorne, with respect to his legal opinion, he not being qualified. It is admitted by the attorney for the appellant that Mr. Silverthorne was a local recording agent of the appellant and Mr. Silverthorne so testified. Mr. Silverthorne testified he was called before November 6, 1959, by someone from the appellee's office for additional coverage. It is also undisputed that appellant knew of the accident here in question before issuing the rider dated November 25, 1959. It is also acknowledged that the appellant received and accepted the premium covering the Shantzer Drier from November 1, 1959. The policy was cancelled April 21, 1960. As to that cancellation Mr. Silverthorne testified as follows:

"Q Mr. Silverthorne, when you cancelled that policy out in April, you cancelled it out on a short-term basis?

"A No, sir.

"Q But you did charge insurance on that Shantzer Drier from November 1 until the date it was cancelled?

"A Yes, sir.

"Q And as far as anybody denying that this Shantzer Drier was not covered, you are not a party to that denial, are you?

"A No, sir,

"Q You say it was covered?

"A Yes, sir.

"Q And you were the agent for this company?

"A Yes, sir.

"Q You took this man's money and, as far as you are concerned, it's covered?

"A Yes, sir."

Since Silverthorne was appellant's recording agent, his authority and the extent thereof was controlled by the provisions of the Insurance Code, Article 21.14, V.A. T.S. New York Fire Insurance Co. v. Reed, Tex.Civ.App., 138 S.W.2d 138 (writ refused); Home Ins. Co. of New York v. Roberts, 129 Tex. 178, 100 S.W.2d 91; Shaller v. Commercial Standard Insurance Company, 158 Tex. 143, 309 S.W.2d 59.

In the Shaller case the court stated:

"As such, his authority and the extent thereof was controlled by the provisions of the insurance code and his designation as the type of agent prescribed therein. The purpose of the statute was to vest local recording agents with authority co-extensive with that of the company insofar as writing insurance is concerned and to remove all questions of the local agent's actual or apparent authority from the field of cavil or dispute."

It is stated in 44 C.J.S. Insurance § 266, p. 1070 as follows:

"The effective date of the policy does not depend on the time of delivery if the parties have agreed on another date, and the policy is effective from the time agreed on, although it is not delivered until after loss. When so stipulated, the policy on delivery may take effect as of a previous date."

Appellant's points five, six, seven and fourteen are overruled. By appellant's eighth point of error it is contended the court erred in holding the jury foreman, W. M. Rankin, was qualified as a fair and impartial juror and in not setting aside the verdict and judgment. Appellant's complaint is that Mr. Rankin did not disclose that he was a tenant of Mr. LaFont. Mr. Rankin owned a half section of land he farmed and also farmed about one hundred acres owned by Mr. LaFont. Counsel for appellant asked Mr. Rankin if the attorneys

represented him and he said Mr. LaFont did. Counsel did not go any further into this matter. The court on hearing for a new trial overruled appellant's contention as to Mr. Rankin. We find nothing in the record of any misconduct on the part of Mr. Rankin and the finding of the trial court is binding on this court. Hollingsworth v. Williamson, Tex.Civ.App., 300 S.W.2d 194 (NRE); Thompson v. Quarles, Tex.Civ.App., 297 S.W.2d 321 (NRE). Appellant's point eight is overruled.

■ By appellant's points nine and ten it is contended there was no evidence of the actual cash value of the grain tank and its related property and that the evidence was insufficient to sustain findings of actual cash value of the grain tank and its related property. The coverage as set out in the policy provided as follows: "Liability hereunder shall not exceed the actual cash value of the property at the time of the loss, ascertained with proper deductions for depreciation, nor shall it exceed the amount it would cost to repair or replace the property with material of like kind and quality within a reasonable time after the loss * * *" The testimony herein was that there was no market value of the articles here in question. The evidence also showed the articles had just recently been constructed or installed and that there was no depreciation. The evidence then was to the effect that the property was of a certain cash value and also that the amounts testified to would be the reasonable cost of reproducing the property in the same condition that it was in before the happening of the matters here in question. We think under this record appellee was authorized to show the intrinsic value and show the original cost and the amount which it would have reasonably cost to replace the property with materials of like kind and quality and condition. Missouri, K. & T. Ry. Co. of Texas v. Crews, 54 Tex. Civ.App. 548, 120 S.W. 1110. It is stated in the case of Sarkesian v. Cedric Chase Photographic Laboratories, Inc., 324 Mass.

620, 87 N.E.2d 745, 12 A.L.R.2d 899, at 919 as follows:

"The original price in money of personal property having no market value, or the value of the materials and labor going into its production, has, in several actions for loss, conversion, or injury to such property, been held to be a proper element for consideration in determining the actual value of the property, or its value to the owner."

There citing many Texas cases to that effect. See also 17 Texas Juris Prudence 2d, Page 156, Section 82. To the same effect is the case of Fire Ass'n of Philadelphia v. Coomer, Tex.Civ.App., 158 S.W. 2d 355 (NWH). We overrule appellant's points nine and ten.

■ Appellant's points eleven and twelve insist there was no evidence to sustain the findings of the jury as to the amount of judgment covering the grain. It is admitted in appellant's brief that it is liable under the policy for such sum of money as was expended in protection of the grain insured, then insists the expense testified to covered grain not in the tank and not insured. It is to be noticed the only grain inquired about was the grain in the large steel grain tank that was insured as item one. The evidence was that appellee expended $11,015.94 which was necessary to salvage the grain, that such expenditures were necessary and were reasonable. The jury answered $11,000, being $15.94 less than the actual itemized evidence that was shown expended to salvage the grain in the large steel tank. Appellant's points eleven and twelve are overruled.

■ In the judgment of the trial court the court found that the amount of damages as found by the jury was due and owing to the appellee on April 7, 1960, and therefore, the appellee was entitled to interest at the rate of 6 per cent from April 7, 1960. By appellant's point thirteen it is contended the court should have allowed

only interest from the date of the judgment instead of April 7, 1960. The appellee had 90 days to make proof of loss under the terms of the policy as well as under the provisions of Article 5546, Texas Revised Civil Statutes. There is no question but that proof of loss was made within that time. Then appellant had 60 days after proof of loss to pay the amount of loss. The explosion or failure of the big grain tank happened on November 6, 1959. The court allowed 91 days as to filing proof of loss and 61 days thereafter as to the time for payment by appellant, thereby holding appellant owed the amount as found by the jury and was due on April 7, 1960, being 152 days after November 6, 1959. We think interest was due from the time appellant was obligated to make payment. Westchester Fire Ins. Co. of New York v. Cannon, Tex.Civ.App., 79 S.W.2d 920 (writ dismissed). Point thirteen is overruled.

Finding no reversible error, the judgment of the trial court is affirmed.