BEAUMONT, S. L. & W. RY. CO. v. DANIELS. (No. 374.)

(Court of Civil Appeals of Texas. Beaumont. May 27, 1918. Rehearing Denied June 19, 1918.)

1. RAILROADS ⬤⟁17—LIABILITY FOR ACTS OF STATION AGENT.

The station agent of a railroad, in circulating a rumor that plaintiff had stolen the overcoat of a newsboy on a train, cannot be said to have acted as representative of the railroad, or within the scope of his employment.

2. RAILROADS ⬤⟁212—RECEIVERSHIP—TERMINATION — LIABILITY TO PAY JUDGMENT FOR TORT.

Where the federal court which appointed receiver for a railroad ordered the property turned back to the railroad conditionally on its taking all of the benefits and assuming all of the obligations created under the receivership, the railroad was under obligation to pay a judgment for damages predicated on the tort of a servant of the railroad while in the hands of the receiver.

3. LIBEL AND SLANDER ⬤⟁121(2)—EXCESSIVE DAMAGES.

Where a railroad's conductor slandered plaintiff, a respectable and honorable man, by

imputing to him the theft of an overcoat from a train, verdict for plaintiff for $500 against the railroad cannot be set aside as excessive; no improper conduct of the jury being shown, and the compensation for humiliation and mortification suffered by a passenger by reason of insult or slander being within the peculiar province of the jury, as there is no legal measure of damages for such wrong.

Appeal from District Court, Liberty County; L. B. Hightower, Sr., Judge.

Action by T. E. Daniels against the Beaumont, Sour Lake & Western Railway Company. Judgment for plaintiff, and defendant appeals. Affirmed.

See, also, 195 S. W. 625; 186 S. W. 383.

Andrews, Streetman, Burns & Logue, of Houston, for appellant. Marshall & Harrison, of Liberty, for appellee.

BROOKE, J. This was an action for damages for humiliation and mortification, brought by appellee against the appellant. Judgment was rendered in the trial court for appellee. The cause was tried with a jury in the district court of Liberty county, on August 16, 1917. The jury, under instructions from the court, returned a verdict for the plaintiff for the sum of $500. Upon the verdict of the jury the court entered judgment against the Beaumont, Sour Lake & Western Railway Company for the sum of $500. Defendant filed motion for new trial, which motion was overruled by the court. The case is now duly before this court for review.

The plaintiff's petition shows that the transactions out of which the claimed damages were alleged to have arisen center around the disappearance of an overcoat owned by a butcher boy selling his wares on a train being operated over the Beaumont, Sour Lake & Western Railway Company's tracks between the stations of Beaumont, Jefferson county, and Hardin, Liberty county, Tex., on November 18, 1914. It is alleged that plaintiff was a passenger on said train on that date, going from Beaumont to Hardin, and that a few days after said date plaintiff received at Hardin a telegram reading as follows:

"Houston, Texas, 11/19/14. J. E. Daniel, Constable, Hardin, Texas. Please deliver my overcoat to conductor train number four going east Friday a. m. without fail. N. Boccaro, Conductor Fuel."

It is alleged that, while said telegram was addressed to J. E. Daniel, it was intended for and delivered to T. E. Daniels, the plaintiff, who was at that time a constable. The sending of this telegram is made the basis for an allegation of damages on the theory that it carried with it slanderous implications of theft, and that the defendant would be liable therefor. There are further allegations that the station agent at Hardin circulated "in and around Hardin, and to divers people, that the plaintiff had stolen an overcoat from N. Boccaro on defendant's train on November 18th." This is made the basis

of a claim for damages on the theory that such would import liability on the defendant. It was further alleged:

"Now, plaintiff further shows the court: That on the 24th day of November, 1914, he had occasion to be a passenger upon defendant's train on a trip from said Beaumont to Hardin. That on said occasion said conductor, Fuel, was in charge of and operating said train, and said N. Boccaro was upon said train plying his business and trade as a news agent and butcher boy. That when said conductor took up plaintiff's transportation, just after he (plaintiff) boarded said train at Grayburg, on defendants' road, and the car in which plaintiff was riding was crowded with people, the conductor said to plaintiff, 'What did you do with that overcoat you got the other night?' Plaintiff advised him that he had never gotten an overcoat, and knew nothing about an overcoat, and the conductor then and there said in a loud, insulting, browbeating, and bullying manner: 'You got that butcher boy's overcoat the other night. You stole it that night, and you had better dig it up, or we will give you some trouble. We know too much about that coat.' All of which was said in an insulting, loud, browbeating, and bullying manner, and caused plaintiff much mortification and humiliation; said conversation having taken place in the presence of a crowded car, most of the people whom plaintiff did not know. That plaintiff was a passenger on said train, and he had a right to be treated courteously and respectfully while he behaved himself and conducted himself as became a passenger. That he did conduct himself in a proper and gentlemanly manner, and plaintiff was entitled to courteous treatment by said conductor and by all employés, and was entitled to protection by said conductor from employés, passengers, or other people having a right to be on said train, or engaged in a business on said train. That said charge made by the conductor was false and slanderous, and has damaged plaintiff to the extent of $5,000."

The defendant answered by general demurrer and general denial.

[1] The record shows that on November 18, 1914, Boccaro was acting as newsboy on what was known as the Frisco west-bound train, running from New Orleans, La., to Houston, Tex., passing through the city of Beaumont, and thereafter through the station of Hardin; that on that date said Boccaro had an overcoat and same disappeared; that the telegram previously copied herein was sent by Boccaro; and that he signed his name and the name of conductor, Fuel, thereto. No evidence was introduced that the station agent circulated in and around Hardin that the plaintiff had stolen an overcoat from Boccaro, and there is nothing to even suggest that any such rumor could be traced to defendant. If it could be said that there was any evidence that the rumor was circulated by the said agent, it positively cannot be said that, in circulating such rumor, he acted in any sense as the representative of the defendant, or within the scope of his employment by it. It is further shown that T. E. Daniels was a passenger on the eastbound Frisco train on November 24, 1914. The train was in charge of Conductor Fuel, and N. Boccaro was on the train on that date as a newsboy. It is also shown that

a conversation took place between the plaintiff and said newsboy. Plaintiff testified as follows:

"The conductor took up my fare on the night of the 24th. When he came to me, I handed him my pass; he just looked at it. I handed him my transportation. He just looked at it, and says, 'What did you do with that butcher boy's coat you taken off the train the other night?' And I told him I hadn't taken any butcher boy's coat off the train. He said, 'Yes, you did.' I said: 'No, sir; I never taken any butcher boy's coat.' I said: 'I had this one, this is the only coat I had. I had my overcoat on.' He says, 'Yes, you did, you taken that butcher boy's coat off.' He said, 'You never had any coat at all when you got on the train, and you taken one off.' He says, 'You had better dig that coat up.' He says: 'We are going to give you trouble. We know too much about it.' He said that they knew too much about the coat, said I had better dig it up. I told him I hadn't got it. I told him—he said they were going to give me trouble about it, and I told him to go ahead and do it. He said, 'You stole the butcher boy's coat off of the train that night.' He turned around and walked off then. After that, on the train, the butcher boy, Boccaro, approached me and asked me what I had done with the coat. I told him I hadn't had his coat. He says: 'Yes, you did. You got my coat down from out of the rack and wrapped a little boy up in it when you got on the train.' I told him I had not. I said, 'I wrapped him up in my coat.' He says, 'Oh no, you didn't,' says: 'You got my coat and taken it off the train when you left. You stole it.' I told him he was a damned liar. He turned around and walked off."

He further testified:

"When they accused me of stealing the coat, I was coming from Beaumont. I got on the train at Grayburg. I was in the smoker. I think I sat somewhere along about the middle of the car. The conductor was the first one of the train crew that I saw after I got on the train; that was when he came to take up my transportation. I had not seen or talked to any other member of the train crew before that. I had previously received a telegram, the one that you introduced in evidence, and understood from the wire that it related to a coat which somebody had thought had been taken off the train, and somebody had thought I had gotten it. I did not know what the telegram meant, I did not know whether it was a mistake, or what it was. I told the agent at the time that they was bound to be mistaken. I did not know anything about the butcher boy's coat. I knew that there was a coat involved, and I knew the parties were interested in it. When I got on the train, I did not undertake to find these people and make any explanation in any way whatever. If they had given me time, I would, as I intended talking to them about it. I intended to explain. I do not know whether it was an honest mistake, or what it was.

"I cannot explain to the jury how a man who did not know my name or what I was would be wiring about a coat unless he honestly thought I had it. I would say that you are correct in asserting that if I had thought of that I would want him to get straight on that. Now, as to whether or not it would have occurred to me that 'the next time I see that man I am going to find out what is wrong here,' and notwithstanding the fact that I did not make any effort at all when I was on the train to do so, the only answer I can make is that I did not have time. The train had not gone any distance after I got on it before the conductor came to me. He was in the negro coach, and coming on through just after the train started. I had not gone down to the station at any time to try to see them. I had not been around the station at all, only the day I got the telegram, the morning I left Beaumont. I was away from home the biggest part of the time. I did not write a letter to either one of them, nor did I offer to send a collect wire to them. I did not phone or telegraph them. I just told the agent there, Mr. Strophner, to tell them I knew nothing about the coat; I had to go to Batson that night, and I could not meet the train.

"Q. Now, there you have a situation where a man in wiring you about a coat, apparently thinking you took it off, no intimation he thought you were trying to steal it, in the telegram; you get on the train, and he comes to you and has a conversation with you about it, in which he tells you about it, and I want to know if it was not a real friendly conversational way that he said it. A. No, sir.'

"He said, 'I saw you take that coat off the rack and put it on that little boy.' Afterwards he said to me: 'I thought that was all right. I did not object to that.' The butcher boy told me, 'I had no idea you were going to take the coat off until I saw you getting off with it.' It is not a fact that that was about all he told me, except that he asked me to get his coat for him. He told me he saw me cover up the little boy in the coat; that I got it out of the rack. Says, 'I thought you would put it back when you got through with it.' Said, 'I never thought anything about it until I saw you get off the train with it.' Says, 'Then I thought you had stolen my coat.' On the 18th of November, when I had the little boy with me, it was a little bit chilly, and it was a good idea to spread something over that little boy on the train, which I did. It was my coat which I had. I say that I had a coat with me, and brought it all the way with me from Beaumont. I got tangled up at the station in Beaumont in catching my train, and caught the wrong train, and had to go back to the station and catch the other one."

And further:

"The conductor in the conversation with me mentioned the fact that the coat he saw me get off with was a lighter coat than the one I had on at the time apparently, the night of the 18th. In other words, that was his contention. The coat I say I put over the little boy and got off with that first night was the same coat I had the second night. That is my contention."

[2] It is complained in the first assignment that the court erred, to the prejudice of the defendant, in overruling and in not granting the request for a peremptory instruction in favor of defendant in response to the grounds therefor as shown in defendant's bill of exceptions No. 1, reading as follows:

"That neither the allegations nor the evidence raised any obligation upon the Beaumont, Sour Lake & Western Railway Company to assume and pay off a judgment for damages predicated upon torts of the receiver; there being nothing to indicate a decree of the federal court fixing such a liability and responsibility upon the railway company."

Under this assignment are two propositions, as follows:

(1) "There can be no recovery against a railway company for the torts of one appointed by a federal court having jurisdiction as receiver of said railway company after the discharge of the receiver by said federal court, unless it is alleged and proved that: (a) Earnings were spent for betterments by the receiver; or (b) there was an assumption by the railway of responsibility for the acts of the receiver; or (c) the order discharging the receiver expressly made the property returned to the railway com-

pany subject to the claims for which the railway company is sought to be held."

(2) "There was no proof of earnings spent for betterments by the receiver of the Beaumont, Sour Lake & Western Railway Company, no proof of assumption of liability by the railway for the acts of the receiver, and the order of the federal court under which the property was returned by the receiver to the railway company does not make the railway company liable for torts of the receiver, but only makes the railway company liable for certain contractual obligations, and therefore there can be no recovery against the Beaumont, Sour Lake & Western Railway Company by the plaintiff for an alleged tort of the receiver of the Beaumont, Sour Lake & Western Railway Company."

In the case of St. Louis, Brownsville & Mexico Ry. Co. v. Elbert Webber, 202 S. W. 519, recently reported, and which involved the identical proposition here urged, this court, in passing upon the same, used the following language:

"It appears that the receivership was a friendly one, wherein the defendant appeared, waiving time, and consented to the appointment of Frank Andrews as receiver, to take over and operate its premises, and that it was pursuant to this consent action that such receiver was appointed, to wit, on July 5, 1913.

"It further appears that by the defendant's application for discharge of the receiver, filed April 14, 1916, under oath of its vice president, J. S. Pyeatt, it appeared that the defendant had financed and provided for the payment or taking care of the various demands against it, so that the receivership had accomplished its purpose, and that it then, as a means of getting the property returned to it, stated to the court that it was 'ready and willing to assume and able to pay all obligations incurred by said receiver of every kind whatsoever, and, that, with this offer of payment, it requested and prayed that the property be delivered to it by order of the court,' subject to such terms and conditions as the court may impose, to secure the payment of the receiver's obligations and the performance of the receiver's contracts incurred by said receiver as such while administering the property of said railway company.

"It appears further that, by the order discharging the receiver, it was directed that all of the defendant's properties, rights, franchises, privileges, and immunities, and all claims, demands, accounts, notes, and bills of every kind and character, whatsoever and wheresoever situated, be delivered to it, and that the defendant so receiving back such property, its successors and assigns should 'take all of the benefits and assume all of the obligations' created by certain contracts entered into by the receiver under orders of the court, and should 'especially assume all of the obligations of said receiver' and should 'pay off, satisfy, and discharge, according to their terms, tenor and effect, all receiver's certificates,' and should 'especially assume all of the obligations assumed by said Frank Andrews, receiver, under a certain specified contract with the Guaranty Trust Company of New York, trustee, for the purchase of equipment.'

"It seems that by such order of discharge the court stripped itself of every item of property that could be made available for payment of the plaintiff's claim, and retained jurisdiction only in the event the defendant failed to make payment of any amount which it 'has assumed to pay, pursuant to the provision hereof, as and when the same shall hereafter become due and payable,' so that, if the plaintiff's cause of action was not within the terms of the decree, there was no provision made for payment of such claim by reserved jurisdiction or otherwise.

"After the defendant had given its receipt, on May 27, 1916, to the receiver for 'all the properties, rights, franchises, privileges, and immunities of every kind and character whatsoever, held, claimed or possessed by him as receiver,' it passed at a regular meeting of its board of directors a resolution, to wit, June 6, 1916, whereby, in recognition of its obligation to pay such demands as the obligation in question, it formally acknowledged receipt from said receiver of all such property, and bound itself to him in the words, 'and the said Frank Andrews, as receiver as aforesaid, is hereby released and relieved from all liability, claims, demands, and actions of every kind and character whatsoever. in so far as the St. Louis, Brownsville & Mexico Railway Company has the power to grant such release.' The plaintiff's cause of action arose out of and during the aforesaid receivership of Frank Andrews of the properties of the defendant, or negligence chargeable to such receiver towards a servant, and is an unpaid liability of such receiver.

"Nothing in the federal court's order in this case granting a discharge of the receiver and the redelivery of the property held by the receiver hints at or suggests any immunity of the defendant from the recovery adjudged against it in this case by the court below, but, on the contrary, provides for the liability here asserted.

"In our judgment, the recovery was proper against the defendant, under its assumed liability."

The assignment is overruled.

[3] The second assignment of error complains that the verdict of the jury in the amount thereof is grossly excessive, and evidences, not a fair and impartial consideration of the testimony, but sympathy for the plaintiff, or bias and prejudice against the defendant, or some other improper motive.

The appellee, so far as shown by the evidence, was a respectable and honorable man, and the law presumes him to be of good character. The charge against him was, if true, defamatory of his character and good name. There has been shown, so far as this record shows, no improper conduct of the jury. The compensation for damages for the humiliation and mortification that a passenger suffers by reason of being insulted or slandered is within the peculiar province of the jury. There is no legal measure of damages for such wrongs.

A careful examination of the record discloses that the appellant has had a fair and impartial trial, and there is no error manifest in this record which would cause this case to be reversed.

The judgment of the lower court is therefore in all things affirmed.