Erwin C. WINKEL, II, M.D., et al., Appellants,

v.

John W. HANKINS, Appellee.

No. 5290.

Court of Civil Appeals of Texas, Eastland.

July 26, 1979.

Rehearing Denied Aug. 30, 1979.

Charles G. Lowry and Joel B. McCarty, Jr., Lowry, Pruett & McCarty, Lawrence T. Newman, Nathan, Nathan & Newman Co., Houston, for appellants.

David M. Freedman, Houston, W. James Kronzer and Robert B. Ballard, Kronzer, Abraham & Watkins, Houston, for appellee.

RALEIGH BROWN, Justice.

This is a slander case. John Hankins sued Norma Harris and Erwin C. Winkel for actual and exemplary damages because of their allegedly slanderous statements falsely accusing him of stealing $10,000 from the hospital where he was an employee and in which defendants had a financial interest. The jury found Harris and Winkel each had made statements that Hankins had stolen $10,000, that the statements were false and were made with malice. The jury awarded $750,000 actual damages and assessed against each defendant $100,000 exemplary damages. After Hankins voluntarily remitted $250,000 of the actual damages award, judgment was rendered for $500,000 actual damages against the two defendants jointly and severally, and against each of them individually for $100,000. Harris and Winkel appeal. We affirm.

Hankins was hired by a group of investors to assist in the planning and construction of North Central General Hospital. After the hospital opened in January, 1974, Hankins became hospital administrator and continued in such capacity until June, 1974, when he was discharged. Winkel and Harris were physicians and two of the doctor-investors in the hospital project. Winkel specialized in urology and was Chief of Medical Staff during the spring of 1974. Harris was the hospital's resident radiologist.

Financial problems developed even before the hospital opened and the doctor-investors were required to invest more money or guarantee hospital indebtedness to permit its opening and to keep it operational. Witnesses agreed that the business manage-

ment of the hospital was the responsibility of Hankins as administrator. During the spring of 1974, there were five members on the Board of Directors of the hospital. Three testified that they lost confidence in Hankins because of various problems at the hospital. Two testified supportively of Hankins.

It was during the spring of 1974 that Harris learned that Hankins had received a check for $10,000 from the hospital in December, 1972. She received a copy of a document, allegedly the corporate minutes of a December 8, 1972 Board of Directors meeting, authorizing the $10,000 payment. Hankins alleged that during the spring of 1974, rumors were being circulated around the hospital by the defendants that he had stolen $10,000 from the hospital. He contended he received the $10,000, which was authorized by the Board of Directors in the meeting of December 8, 1972, as an advance for work performed on the professional building located adjacent to the hospital.

Hankins was indicted in November, 1974, for theft of $10,000 from North Central General Hospital. The indictment was subsequently dismissed for insufficient evidence.

After he was discharged as administrator of the hospital, Hankins brought the instant suit alleging that Winkel and Harris entered into a conspiracy to do him harm, made slanderous remarks about him, and accused him of stealing from the hospital. Hankins contended that the defendants acted with malice and caused him to be discharged, damaging his reputation to such an extent that he could not obtain employment thereafter as a hospital administrator.

Appellants suggest that their complaints of error can be basically condensed into two areas. First, they argue that the case was tried on hearsay, opinions, conclusions, and speculations from plaintiff's witnesses with regard to whether or not appellants made statements that Hankins was stealing from the hospital. Second, they complain that evidence by defense witnesses concerning the questioning of a document alleged to be corporated minutes was excluded.

Harris, in two points of error, and Winkel, in seven points of error, specifically urge that the trial court erred in admitting into evidence plaintiff's exhibit 3 which was a copy of the minutes of the hospital Board of Directors dated December 8, 1972, and in excluding parol testimony questioning it.

The issue of whether the $10,000 was stolen by Hankins or was paid to him as a bonus was a major item of controversy in the instant case. The exhibit stated in part:

> The next item concerned remuneration for Dr. Hankins for past work during which time he had worked on the project without pay, as well as for services that he had provided above and beyond his current work. The Board was in full agreement as to the necessity for remuneration and felt that he should be advanced $10,000.00 towards work that he had accomplished to date on the professional building and further recognized the fact that he will continue to work towards insuring occupancy of the professional building. Upon motion duly made and unanimously carried, it was
>
> > RESOLVED that John W. Hankins be awarded the sum of $10,000.00 for work done on the professional building in the year 1972. Payment to be made immediately.

Dr. Eaton, chairman of the hospital board on December 8, 1972, testified as to that meeting. He identified the exhibit as a true and accurate copy of the minutes of the meeting and said that he approved those minutes after they were typed up and presented to him.

On offer of the exhibit, only counsel for defendant, Harris, objected saying:

> Your Honor, we object these minutes are not regular—if they are being introduced as regular minutes of the corporation, we object to them. They are not proper. The predicate has not been laid.

> The Court: You're overruled.

> Mr. Newman: Please note our objections, Your Honor.

These are not properly signed by the secretary of the corporation, nor shown that they were approved as being accurate minutes.

■ The objection that "the predicate has not been laid" is too general and the overruling of same is not reversible error. As stated by the court in *State v. Stiefer,* 443 S.W.2d 275 (Tex.Civ.App.—Tyler 1969, writ ref'd n. r. e.):

> The objection made was that the proper predicate had not been laid for the proffered testimony. The objection is too general to warrant consideration without specifying wherein the predicate is inadequate. Objection to admission of evidence should be specific, not general, and must be such as can be understood by the court and obviated by other evidence introduced by the opposing party, if possible. *Bohanan v. Hans,* 26 Tex. 445 (S.Ct. 1863); *Dabney v. Keene,* 195 S.W.2d 682, 684 (Tex.Civ.App., El Paso, 1946, writ ref., n. r. e.); *Loumparoff v. Housing Authority of City of Dallas,* 261 S.W.2d 224, 228 (Tex.Civ.App., Dallas, 1953, n. w. h.); 56 Tex.Jur.2d, page 516, Sec. 171.
> . . .

The court in *Burleson v. Finley,* 581 S.W.2d 304 (Tex.Civ.App.—Austin 1979, no writ) said:

> A valid objection to the offer of evidence is one that names a particular rule of evidence that will be violated by the admission of the evidence. *De Garca v. Galvan,* 55 Tex. 53 (1881); *Walker v. Great Atlantic & Pacific Tea Co.,* 131 Tex. 57, 112 S.W.2d 170 (1938); *University of Texas System v. Haywood,* 546 S.W.2d 147 (Tex.Civ.App.1977, no writ). The purpose of requiring a specific objection is, of course, to enable the trial court to understand the precise question and to make an intelligent ruling and to afford the offering party an opportunity to remedy the defect if possible. 1 McCormick and Ray, Texas Law of Evidence § 24 (1956).

■ The trial court did not rule on the second objection and the record does not reflect that any attempt was made to obtain a ruling. No error was, therefore, preserved. As stated by the court in *Citizens of Texas Savings & Loan Association v. Lewis,* 483 S.W.2d 359 (Tex.Civ.App.—Austin 1972, writ ref'd n. r. e.):

> In a conventional trial, one who objects to evidence must secure a ruling from the court on his objection in order to preserve the point for appellate review. See *Webb v. Mitchell,* 371 S.W.2d 754 (Tex.Civ.App. 1963, no writ). . . .

If, in fact, the trial court erred in the admission of plaintiff's exhibit, appellants have failed to preserve such error.

Appellants' complaint that the trial court erred in excluding parol testimony questioning the exhibit is not supported by the record. An attempt to perfect alleged errors in excluding the testimony was made by interrogation of witnesses Nathan, Bransford, Harris, Wooten and Denman out of the presence of the jury. However, the evidence was neither offered before nor after the making of the bills of exceptions. The record reflects an off-the-record conference was held and subsequently, bills of exceptions made. The record does not show that the court made a ruling excluding the testimony. No error is preserved. *City of San Antonio v. Condie,* 329 S.W.2d 947 (Tex.Civ.App.—San Antonio 1959, writ dism'd).

The court in *Plyler v. City of Pearland,* 489 S.W.2d 459 (Tex.Civ.App.—Houston (1st Dist.) 1972, writ ref'd n. r. e.), considering a complaint that the trial court erred in excluding certain evidence, said:

> After an unreported argument to the court and an unreported ruling by the court, the attorney for appellant proceeded to offer testimony on a bill of exceptions out of the hearing of the jury. Further questions were put to Mr. McClellan, and nine other witnesses were called and examined on the bill. There is no showing in the record that the testimony of these witnesses was offered into evidence and that it was excluded by the trial court. Neither the ruling of the trial court, nor the understanding, if any, with regard to the mechanics of taking the Bill

of Exceptions, is found in the record. The record does not show that appellee objected to evidence concerning the location of appellant's property with reference to the City boundaries, or that the evidence was offered for that limited purpose. The point that the trial court erred in refusing to admit this evidence cannot be sustained. *Self v. Becker,* 195 S.W.2d 701 (Tex.Civ.App.—Texarkana 1946, writ ref., n. r. e.); *City of Denison v. Corcoran,* 253 S.W.2d 321 (Tex.Civ.App.—Austin 1952); *City of San Antonio v. Condie,* 329 S.W.2d 947 (Tex.Civ.App.—San Antonio 1959, writ ref., n. r. e.); *Seele v. Seele,* 371 S.W.2d 922 (Tex.Civ.App.—San Antonio 1963, writ ref., n. r. e.).

Furthermore, even if the testimony of the five witnesses given on their bills of exceptions had been offered in evidence and assuming some of the testimony was admissible, the court would not have erred in refusing the offered testimony because the bills of exceptions contained other objectionable matter. The court in *Texas Reciprocal Ins. Ass'n v. Stadler,* 140 Tex. 96, 166 S.W.2d 121 (1942), opinion said:

The rule is settled that where evidence is offered as a whole, some of which is inadmissible, it is not error for the trial court to exclude the whole upon proper objection. *Robinson v. Stuart,* 73 Tex. 267, 11 S.W. 275.

See also *Texas Employers' Insurance Association v. Creswell,* 511 S.W.2d 68 (Tex.Civ. App.—Eastland 1974, writ ref'd n. r. e.).

We overrule appellants' complaints that the trial court erred in the admission of testimony which they contend was hearsay testimony to the effect that appellants had accused Hankins of stealing money from the hospital.

The first of such testimony was during the direct examination of Carol Janet Porter, to-wit:

Q  Okay. Now, during the late spring and early summer of 1974, did you become aware of rumors that began to spread in the hospital about John Hankins?

A  Most definitely.

Q  Would you relate to the Court and jury, please, ma'am, in your own words, what you began to hear?

A  I began hearing people—

Mr. Lowry: At this time I want to object. If she can't name these clients as parties to this conversation, this is hearsay.

The Court: Do you expect to follow this—

Mr. Ballard: Yes, I do.

The Court: All right. Go ahead.

A  (By the witness) Yes, sir. I heard—I was in conversations with nurses, and they were talking about hearing others talking about John's stealing money, asking me if I believed it; and I said absolutely not. And the general feelings of the nurses, they were very concerned, they were upset about the rumors, because they didn't believe it either.

I never spoke to a nurse who believed it, but, I heard about he was stealing money, $10,000 here and the hospital costing more than it was supposed to, and he had stolen this, and that was why it was costing more, and he was not qualified for his position, and the reason he had acquired certain material goods was because he had allocated "X" amount of funds illegally and—

Q  Indicating that he had taken money?

A  Right.

Q  From the hospital?

A  Right.

Q  For himself?

A  Right. And, I never personally heard any of the people that were in question, but I heard nurses say that they heard Doctors so-and-so and Dr. so-and-so heard it. I never did—

Q  Now, from what you heard and what you observed, were you able to determine the origin of who was starting the rumors?

Mr. Lowry: Your Honor, at this time, again I object. I believe that is

hearsay. If this lady cannot say that she heard someone making these statements, it is hearsay and we object to it.

The Court: He said he was going to follow through. If he doesn't follow through, I will strike it.

Mr. Lowry: Please note our exception.

Q (By Mr. Ballard) Were you unable to identify the source of the rumors?

A Yes. I heard the name of Dr. Winkel and the name of Dr. Harris, and I personally never heard them say anything.

Q They didn't come to you, specifically, and tell you that?

A No. I never heard them say anything, but in the course of conversations, people would say this was what they heard these individuals say, but I personally never did.

■ What the witness had heard was admissible evidence on the issue of Hankins' damages. As stated by the court in *Belo & Co. v. Wren,* 63 Tex. 686 (1884):

The amount of damages in a libel suit is left largely to the discretion of the jury. They may take into consideration the motives of the publisher; and if the libel has been sold to the public indiscriminately, heavier damages are given, and evidence as to the mode and extent of the publication is at all times admissible. . . .

Therefore, the general hearsay objection was insufficient and the court correctly overruled same. The court in *Buck v. Savage,* 323 S.W.2d 363 (Tex.Civ.App.—Houston 1959, writ ref'd n. r. e.) said:

In holding that it was not error for the Trial Court to overrule such an objection, our Supreme Court in *Brown & Root v. Haddad,* 142 Tex. 624, 180 S.W.2d 339, 341, said: "A general objection to evidence as a whole, whether it be oral or documentary, which does not point out specifically the portion objected to, is properly overruled if any part of it is admissible." The Court cited many cases supporting its ruling.

Appellants did not then or subsequently move to strike that or any similar answer. They made no request for an instruction to the jury limiting consideration of the testimony to the effect that it could not be considered as evidence of the fact that Harris and Winkel had made the slanderous statements. Appellants, therefore, failed to perfect error as to its admission. *Blaugrund v. Gish,* 179 S.W.2d 266 (Tex.1944).

■ Even assuming the court erred in its admission of the above testimony, the record reflects that similar testimony was given without objection by witnesses, De Marco, Eaton and Tovar. No request was made by defendant to instruct the jury not to consider that testimony. Harris and Winkel thereby waived Winkel's attorney's objection to the testimony of Porter. *Hundere v. Tracy & Cook,* 494 S.W.2d 257 (Tex.Civ. App.—San Antonio 1973, writ ref'd n. r. e.); *New Hampshire Fire Insurance Company v. Plainsman Elevators, Inc.,* 371 S.W.2d 68 (Tex.Civ.App.—Amarillo 1963, writ ref'd n. r. e.); *Rowe v. Liles,* 226 S.W.2d 253 (Tex. Civ.App.—Waco 1950, writ ref'd).

■ We disagree with appellants' contention that there is no evidence or insufficient evidence to support the jury's findings that each defendant accused Hankins of stealing from the hospital and that such statements were false and made with malice.

Minerva Karr, on cross-examination, testified in part:

Q Now, you said that you heard rumors that John Hankins had stolen money and that you wanted to ask Dr. Winkel if he believed this?

A No, I didn't say I heard rumors, I heard Dr. Winkel say it.

Q You heard Dr. Winkel accuse Mr. Hankins of stealing money?

A $10,000. Yes, sir.

Dr. Donald W. Smith testified in part:

Q . . . Did Dr. Harris or Dr. Winkel, ever make a statement in your presence that John Hankins had taken or stolen $10,-000?

A These statements were made to me by Dr. Harris.

Q   Do you recall approximately when it was?

A ·  It was in the late springtime of 1974.

Q   The statement that John Hankins had taken $10,000?

A   That he had misappropriated $10,000.

Q   Okay.  So that we don't deal in semantics and words of art, was your impression from that statement that John Hankins had stolen money?

A   Yes, sir.

 .     .     .     .     .

Q   .  .  .  In your checking, as a member of the creditors committee, did you ever find one dime that John Hankins took that didn't belong to him?

A   There was no evidence of that.

Q   Did Dr. Harris ever mention to you that if Hankins did not leave, she and others would file criminal charges against him for certain land transactions?

A   I remember that being discussed.

Q   Were you aware of a petition that she was circulating to remove him from his position as administrator?

A   Yes, sir, I was.

Q   When would that be, again, in March and April?

A   Right around that frame of time.

Q   Did you feel that Dr. Harris, in every way, tried to undermine the Hankins' administration?

A   Yes.

Q   I believe she even mentioned to you that John Hankins was having an affair with Sharon Price?

A   That was mentioned also.

Q   Did you gather that was of the illicit sexual variety?

A   I assumed it was a rather friendly relationship, tending towards the sexual.

Q   Okay.  Did Dr. Harris ever call Hankins an egomaniac?

A   Yes, she did.

Earl Strother testified:

Q   Now, subsequently, in June, I believe, 1974, a group of people got together and gave him a statement and fired him, and then there was another board meeting to either affirm or rescind that firing.  Do you recall that?

A   Again, I can't be specific about the date.  I was at the meeting and not as an official board member, but as I recall, as an ex-officio, and as an interested party.

Q   You were still an investor or connected with the corporation?

A   That's correct.

Q   I want to talk about that particular meeting where everyone came to either confirm or deny his firing.  Did you have an occasion to speak at the meeting?

A   I did.

Q   Do you know if Dr. Winkel or Dr. Harris had an occasion at the meeting?

A   The room was full of people.  A lot of people said a lot of things, and I specifically cannot recall any specific words that either one of them said at the meeting, during the session.

Q   Do you recall any specific words that either of them may have said after the meeting?

A   Only Dr. Harris.

Q   What was the occasion?

A   During the meeting I had tried very hard to get John put on ice, I guess is the correct term to use, defuse the situation.  My pleadings with them was, don't fire him, give him an extended vacation, the hospital is the important thing; his situation is something else entirely, and the first order of business should be taking care of the hospital and moving on and not having dissension.  My words fell on deaf ears.

Q   Was there a considerable amount of dissension?

A   There was just a whole lot of talking about it.  If the word dissension is the correct word to use or not, I don't know.  I think there was mixed feelings on everybody's part.  But, everybody felt like the situation had reached a point that something had to be done, and my solution to the

thing was to put him on a vacation, forget his problem, forget the problems of the people who had problems with him, and get on with the business and let this sore stop causing dissension, and move on. After the meeting officially broke up, and I walked around where the little bar was and Dr. Harris came there or she may have already been stopping there, and I said to her, words to the effect, "I wish you all hadn't done this." And I felt like that, you know, it was not in the best interest of the project, and—

Q That was the firing?

A The firing. Well, the whole controversy, it was something that caused dissension and caused people to not to support the hospital and not to utilize the hospital. It just wasn't good for business, very bluntly, and her words to me was, "After what John has done to me and my family, I don't care."

.    .    .    .    .

Q . . . What was the statement, what was the gist of her statement?

A Basically that she had no remorse over what had happened, that after what John had done to her and her family, she didn't care.

.    .    .    .    .

Q . . . To this point, when Dr. Harris made those statements to you, did you or not get the impression that what she had done at the meeting to John Hankins, was based upon something that had happened some time ago?

A That's correct.

Q And did you gather that it was a personal matter to her?

A That's correct.

Mr. Nathan: I object to his leading the witness.

The Court: Don't lead, counsel.

Mr. Ballard: I'm sorry, Your Honor.

Q (By Mr. Ballard) In your opinion, Mr. Strother, if you have such an opinion, were the actions that Dr. Harris took towards John Hankins based upon personal motives?

A Yes.

Q And do you feel, or in your opinion, if you have such an opinion, were those personal motives related to actions taken by John Hankins against a member of Dr. Harris' family in the past?

Mr. Lowry: Again I object that he is leading the witness.

The Court: Rephrase your question. Sustain to the form in which you have asked the question.

Mr. Ballard: Thank you. I will rephrase it.

Q (By Mr. Ballard) Mr. Strother, can you indicate whether or not, in your opinion, the actions taken by Dr. Harris towards John Hankins, were or were not motivated by an old standing alleged wrong perpetrated by John Hankins against a member of Dr. Harris' family?

Mr. Lowry: I hate to keep repeating, but counsel is still testifying and leading the witness. There has been no evidence—

The Court: He can ask him whether or not it is true, and move on. Overruled.

A In my opinion the motivation behind the problem that existed between the two of them, dealt with John Hankins' firing of Dr. Harris' husband at another hospital where he was administrator.

Q Okay. Now, when you talked with her, did she seem remorseful or sorry that she had done it or did she appear to be glad or did she exhibit any emotion at all?

A I wouldn't say she exhibited joyous emotions, she certainly had no remorse.

Appellant, Winkel, testified:

Q . . . Doctor, did it ever come to your attention that John Hankins was addressing himself as Dr. Hankins?

A Yes, he addressed himself frequently as Dr. Hankins.

Q Did you ever quiz him about how he obtained his Doctorate Degree?

A Not at first. I, like so many others, just addressed him as Dr. Hankins, because he had told me that he was my professional equal.

Q   And Doctor, was there any occasion that ever caused you to inquire into his Doctorate Degree?

A   We have a friend who lacks a few hours of getting a doctorate himself, and we looked into the college situation that might permit him to have this, and Jackie asked me what type of, you know, how to go about having it, and called Houston Public Library, they had a list there of all legitimate colleges in the country and they would be able to give the address of the college that this degree came from.

Q   And what, if anything, did you find out?

A   Well, I found out that Ohio Christian College is not listed in any book.  So, I then wrote the Educational Department of the State of Ohio and I received a letter back from the attorney's office, and I think the Attorney General's office.

Q   And were you subsequently informed that the college had been enjoined from handing out any type of degrees?

A   They wrote me that they considered it a diploma mill and I made a phone call to the Assistant Attorney General and he said that they did consider it a diploma mill and it had been closed down.

Q   Did you then mention this to Mr. Hankins?

A   Well, I started—yes, I caught him in the hallway and we sat down and talked about it and he said what difference did it make, and I told him it was a matter of some difference, just being truthful as to the degree and that I was not going to call him Dr. Hankins any more, and I talked to him eyeball-to-eyeball, and I said I will call you Mr. Hankins.

Q   Now Doctor, what did John reply after you said I will call you Mr. Hankins?

A   I don't remember the exact words, except he was not too happy with that.

Q   And this was an eyeball-to-eyeball confrontation?

A   Eyeball-to-eyeball confrontation, sitting in the first floor on one of the structures.

Q   And did you tell Mr. Hankins that his degree was a phony?

A   No, I said the college the degree had come from was closed down as a diploma mill and that the department won't rule on the individual piece of paper, but the college was not considered a valid college.

Q   Did he tell you, at that time, he obtained his Ph.D. Degree for the total sum of $500?

A   No, he never told me that.  He never told me the amount of money he got it for or anything.

Q   Did he tell you he did this by correspondence?

A   He said that he had sent some kind of something in and I am vague on that, I think that I was telling him that it was what I had discovered and he didn't say much of anything for once.

The court in *Behee v. Missouri Pac. Ry. Co.,* 71 Tex. 424, 9 S.W. 449 (1888) said:

Malice is rarely ever shown by direct evidence.  It is commonly a state of mind indicated and inferable from other facts proved,—from language used, or acts, or both together.  We infer a bad motive when an injurious act is intentionally done without legal excuse.  The motive is not a bare fact of itself, susceptible of proof like any other fact; it is a conclusion deduced from acts or words. . .

As the court said in *Canales v. Salinas,* 288 S.W.2d 207 (Tex.Civ.App.—San Antonio 1956, writ dism'd):

The repetition and republication of charges may establish malice.  *Behee v. Missouri Pac. Ry. Co.,* 71 Tex. 424, 9 S.W. 499; *Missouri Pac. R. Co. v. Behee,* 2 Tex.Civ.App. 107, 21 S.W. 384; Newell, 4th Ed. p. 322; 33 Am.Jur., Libel and Slander, § 268. . . .

Giving credence only to the evidence favorable to the findings and disregarding all evidence to the contrary, we hold the findings are supported by evidence of probative value.  *Martinez v. Delta Brands, Inc.,* 515 S.W.2d 263 (Tex.1974).  We have examined

the entire record and hold the evidence is factually sufficient to support the findings. *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660 (1951).

■ Appellants argue that the trial court erred in refusing to submit their requested special issues which they contend contained an inquiry material to their pled affirmative defense of privilege, specifically that of good faith.

The jury found that both Harris and Winkel "made oral statements to, or in the presence and hearing of, persons other than the officers, directors, shareholders or doctors on the medical staff of North Central General Hospital, that John Hankins was stealing from the hospital." Such statements were found to be false and made with malice. The jury also found that both Harris and Winkel made such statements to or in the presence and hearing of the officers, directors, shareholders or doctors on the medical staff of the hospital and such statements were false and made with malice.

Appellants requested that in the event the jury found that they had made the statement that "such statements, if any, were made in good faith, in reference to a matter in which (each appellant) had an interest for the purpose of protecting that interest; or that such statement, if any, were made in good faith in the discharge of a duty, and looking to the prevention of a wrong to another."

The court in *Buck v. Savage,* 323 S.W.2d 363 (Tex.Civ.App.—Houston 1959, writ ref'd n. r. e.), discussing the defense of privilege, said:

A qualified or conditional privilege, as we understand the rule, comprehends bona fide communications, oral or written, upon any subject in which the author or the public has an interest or with respect to which he has a duty to perform to another owing a corresponding duty. Such privilege is termed conditional or qualified because a person availing himself of it must use it in a lawful manner and for a lawful purpose. The effect of the privilege is to justify the communication when it is made without actual malice. 27 Tex.Jur., p. 649, Sec. 35, Libel and Slander. It may be said, therefore, that where a statement or publication is made under circumstances which render it conditionally privileged, though it be false, malice cannot be inferred therefrom, nor can it be based upon the character of the language used alone. . . .

The law, therefore, places the burden on the plaintiff to prove that the defendant in the exercise of a conditional privilege was prompted or partially prompted by malice or a want of good faith. *Nunn v. Webster,* supra; *Cranfill v. Hayden,* 97 Tex. 544, 80 S.W. 609; *International & G. N. Ry. Co. v. Edmundson,* supra [Tex. Com.App., 222 S.W. 181]; 27 Tex.Jur., p. 676. Moreover, if the defendant was in any degree actuated by malice in making or publishing a defamatory statement, the privilege is lost. . . .

See also *Dun and Bradstreet, Inc. v. O'Neil,* 456 S.W.2d 896 (Tex.1970); *Cranfill v. Hayden,* 97 Tex. 544, 80 S.W. 609 (1904).

Hankins submitted special issues and secured jury findings that appellants made the slanderous statements with malice, an essential element to his right of recovery as against an affirmative defense of privilege. Appellants' requested issues sought merely to disprove malice. Tex.R.Civ.P. 277 prohibits the submission of inferential rebuttal issues.

The court in *Select Insurance Company v. Boucher,* 561 S.W.2d 474 (Tex.1978) said:

An inferential rebuttal issue is one which seeks to disprove the existence of an essential element submitted in another issue. *Wirtz v. Orr,* 533 S.W.2d 468 (Tex. Civ.App.—Eastland 1976, writ ref'd n. r. e.). Inferential rebuttal issues have been variously referred to as denial issues or argumentative denials rather than direct negatives. *Scott v. The Atchison, Topeka and Santa Fe Railway Company* (Tex. 1978). The reasoning behind such labels is that "they disprove by establishing the truth of a positive factual theory which is inconsistent with the existence of some

factual element of the ground of recovery or defense relied upon by the opponent, and are therefore to be distinguished from a flat denial . . . ." Hodges, Special Issue Submission in Texas, Section 15, at 40. The basic characteristic of an inferential rebuttal is that it presents a contrary or inconsistent theory from the claim relied upon for recovery. . .

We hold the trial court correctly denied appellants' requested special issues.

■ Appellants challenge both the compensatory and exemplary damage awards contending the evidence was legally and factually insufficient to support such awards and also that such awards were grossly excessive.

The compensatory damage issue submitted to the jury included the elements of past and future "embarrassment, humiliation and mental anguish," past and future "loss of general reputation for honesty" and past and future loss of "ability to obtain and retain employment." The jury was required to make a single finding.

In addition to testimony previously set forth, the record reflects that Hankins was fifty years old at the time of the trial. He had been engaged in the medical field for about thirty-three years. His testimony shows considerable training and experience in hospital administration including a master's degree in hospital administration from Washington University, St. Louis, Missouri. At the time of his discharge as administrator from the hospital, he was making a salary of $30,000 a year and received fringe benefits such as a car and insurance coverage. Since his discharge, he had had no significant employment. The fact of his indictment for taking $10,000 from the hospital received newspaper, radio and television coverage, but when the indictment was dismissed wide coverage in the media was not given. Hankins had not been able to get a job in his professional field since his discharge from the hospital.

Witnesses Eaton and Johnson testified that Hankins would never be able to get a job as a hospital administrator.

Witness Hepner, a professor at Washington University who was in charge of the graduate program in health care administration, had known Hankins since 1958 as a student and as a hospital administrator. Hepner testified that before Hankins was discharged by the hospital, Hankins had the highest personal and professional reputation. As examiner for the professional association, the American College of Hospital Administration, Hepner was familiar with the reputation requirement for employment as a hospital administrator. Hepner said, "Since being terminated from North Central General Hospital, it has been nearly impossible for Mr. Hankins to obtain a position in the field of hospital administration."

Hepner further testified that a man of Hankins' training and experience would command a salary of from $40,000 to $55,000 a year with fringe benefits.

As stated by the court in *Associated Press v. Walker,* 393 S.W.2d 671 (Tex.Civ. App.—Fort Worth 1965, writ ref'd n. r. e.):

"Mental suffering on the part of the person defamed is one of the direct results of a libel or slander. Accordingly, injury to the feelings, humiliation, and anguish of mind are proper elements of compensatory damages, provided they are the direct and proximate result of the defamation. This suffering is classed as general damages, that are presumed to have been sustained, and that, in actions for libel, are recoverable under a general averment, without specific proof that they were incurred, and, by virtue of statute, regardless of whether there was any other injury or damage, even though the publication was not libelous per se." 36 Tex.Jur.2d 402, § 98.

"The plaintiff is entitled to compensation for injury to his character or reputation caused by the defamation. * * * It follows that the jury, in fixing the amount of recovery, may consider the loss of, or injury to, character or reputation, even though there is no proof thereof nor any proof of good character. * * * " 36 Tex.Jur.2d 400, § 97.

"In other words, a general allegation of damages will admit evidence of those damages naturally and necessarily resulting from the defamation charged. It is unnecessary to itemize the elements of general damages; rather, the amount may be alleged in the aggregate. Thus, the plaintiff need not aver the nature, character or extent of the mental suffering caused, or even that he thereby suffered any agony, but it is sufficient to aver the damages he sustained by reason thereof. * * * " 36 Tex.Jur.2d 445, § 126.

"Generally speaking, the damages resulting from a libel or slander are purely personal and cannot be measured by any fixed standard or rule. The amount to be awarded rests largely in the discretion of the jury, or the court in a case tried without a jury, and an appellate court will not disturb the verdict or award unless it appears from the record to be excessive or the result of passion, prejudice, or other improper influence. * *

"In fixing the amount the jury may take into consideration the motives of the defendant, and the mode and extent of publication. * * * " 36 Tex.Jur.2d 405, § 102.

The court in *Whalen v. Weaver,* 464 S.W.2d 176 (Tex.Civ.App.—Houston (1st Dist.) 1970, writ ref'd n. r. e.) said:

The amount of damages is peculiarly within the province of the jury. It is true that this Court has authority to require a remittitur if it deems the damages awarded clearly excessive. Damages sustained are purely personal and cannot be measured by any fixed rule or standard. *Beaumont, S.L. & W. Ry. Co. v. Daniels,* 204 S.W. 481 (Tex.Civ.App.,), writ ref.; *Hooker v. Ft. Worth Press,* 11 S.W.2d 586 (Tex.Civ.App.,) n. w. h.; *El Paso Times v. Eicke,* 292 S.W. 594 (Tex.Civ.App.,) dism'd; *Eidinoff v. Andress,* 321 S.W.2d 368 (Tex.Civ.App.,), ref., n. r. e. . . .

We hold the finding of the jury regarding the damage issues are supported by evidence of probative value. *Martinez v. Delta Brands, Inc.,* 515 S.W.2d 263 (Tex.1974). We, also, after having examined the entire record, hold the evidence is factually sufficient to support the findings. *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660 (1951).

We are unable to say under the facts of this case that the damages were the product of passion or prejudice or that they are excessive.

We overrule all of appellants' challenges to the damages awards.

We have considered and overrule all points of error presented by appellants. The judgment is affirmed.